## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JUAN JOSE OROZCO**,

Plaintiff,

v.                                                    **No. 12cv0009 MCA/WPL**

**SAM'S EAST, INC.,**

Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Sam's East, Inc.'s Motion for Summary Judgment, filed July 24, 2013 [Doc. 47].  Defendant seeks summary judgment in its favor on Plaintiff Juan Jose Orozco's claims for national-origin discrimination brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and for racial discrimination brought under 42 U.S.C. § 1981[1].  Having considered the parties' submissions, the record, and the applicable law, and being otherwise informed in the premises, the Court will deny the motion in part because genuine issues of material fact preclude summary judgment on most claims, and will grant the motion in part on one of Plaintiff's claims.

### I.       APPLICABLE STANDARDS

#### A.  Summary Judgment

On a motion for summary judgment , the Court

---

[1]  Although Orozco listed only federal claims in the title of his Complaint, and brings his claim for racial discrimination under 42 U.S.C. § 1981, see Compl. at 1, his counsel apparently cut and pasted a paragraph from another complaint, stating that Thompson's acts "constitute unlawful discrimination against Plaintiff because of *her* race in violation of New Mexico Human Right Act and more particularly *NMSA 1978,§ 28-1-7A (2004),* and Title VII of the Civil Rights Act of 1964."  Compl. at 5.  Defendants have not meaningfully addressed any of Plaintiff's claims brought under state law.

> view[s] the evidence and its reasonable inferences in the light most favorable to the non-movant.  Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party on the issue.  An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim.

*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (internal quotation marks and citations omitted).   The ultimate inquiry in a summary-judgment disposition is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.   Discrimination under Title VII and § 1981.

"Title VII makes it unlawful for an employer "to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).   "Although § 1981 does not itself use the word 'race,' the Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts."  *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987).  By enacting § 1981, "Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics," so a plaintiff who establishes that he "was born" as a member of an identifiable ethnic group, "rather than solely on the place or nation of his origin, or his religion, [] will have made out a case under § 1981."  *Id.* at 613; *see Aramburu v. The Boeing Co.,* 112 F.3d 1398, 1411 n. 10 (10th Cir.1997) (holding that a claim of discrimination "based on Mexican-American ancestry" fell "within § 1981's protection

against racial discrimination," but concluding that § 1981 "does not protect individuals from discrimination based on national origin").

In 1991, Congress amended § 1981 to add a provision stating that "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."   42 U.S.C. § 1981(b).   This modification "'enlarged the category of conduct that is subject to § 1981 liability,'" *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004).   Thus, in the employment context, under either statute, a plaintiff must establish that he is a member of another race, or was born as a member of an identifiable ethnic group, and that his employer intentionally discriminated against him because of his status.   But only Title VII provides a remedy for discrimination based solely on national origin.

> Under Title VII, . . . race and national origin are distinct bases upon which to rest a discrimination charge.   42 U.S.C. § 2000e–2(a)(1) (making it unlawful "to discriminate against any individual ... because of such individual's race ... or  national origin" (emphasis added)); *see Deravin v. Kerik,* 335 F.3d 195, 201 (2d Cir. 2003) (noting that claims of race discrimination and national-origin discrimination are "conceptually distinct" (quoting *Dixit v. City of N.Y. Dep't of Gen. Servs.,* 972 F. Supp. 730, 734 (S.D.N.Y.1997)) (internal quotation marks omitted)); *see also Jefferies v. Harris Cnty. Cmty. Action Ass'n,* 615 F.2d 1025, 1032 (5th Cir.1980) ("The use of the word 'or' [in 42 U.S.C. § 2000e–2(a) ] evidences Congress' intent to prohibit employment discrimination based on *any or all* of the listed characteristics." (emphasis added)).
>
> That said, we do recognize that, at least in certain factual contexts, the demarcation line separating the two forms of discrimination may be quite faint or virtually indiscernible.   *See Deravin,* 335 F.3d at 201 ("However, courts have also recognized that race and national origin discrimination claims may substantially overlap or even be indistinguishable depending on the specific facts of a case."); *cf. Daemi v. Church's Fried Chicken,* 931 F.2d 1379, 1387 n. 7 (10th Cir.1991) ("We are cognizant, however, that often the line between national origin

3

discrimination claims under Title VII and racial discrimination claims under § 1981 is 'not a bright one.'" (quoting *Saint Francis Coll. v. Al–Khazraji,* 481 U.S. 604, 614, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) (Brennan, J., concurring))).

*Lucero v. Sandia Corp.*, No. 11-2028, 495 Fed. App'x 903, 907 n.1, 2012 WL 3667449, *2 n.1 (10th Cir. Aug. 28, 2012) (criticizing the district court's "noteworthy instance of imprecision" in describing and analyzing the plaintiff's Title VII claim for discrimination, which was based only upon national origin).

      In *Meade,* the circuit held "that [a] plaintiff may pursue his cause of action under § 1981 for private employment discrimination despite the applicability of Title VII to the same conduct," implicitly rejecting the notion that a Title VII plaintiff must plead and prove an independent basis for a § 1981 claim. *Meade,* 820 F.2d at 1127. This conclusion is reinforced by the 1991 Civil Rights Act, which allows limited compensatory and punitive damages under Title VII where a plaintiff cannot recover under § 1981, 42 U.S.C. § 1981a(a), and provides that certain limitations and exclusions on damages that would apply under Title VII do not apply under § 1981, 42 U.S.C. § 1981a(b)(4). *See Kim v. Nash Finch Co.,* 123 F.3d 1046, 1063 (8th Cir. 1997).

*Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 858 -859 (10th Cir. 2000). 42 U.S.C. § 2000e-2(m), which was added to Title VII pursuant to the Civil Rights Act of 1991 and which codifies the motivating-factor standard, provides that "an unlawful employment practice is established when the complaining party demonstrates that race, . . . . or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."

      To sufficiently state a claim of discrimination based upon adverse employment actions, a plaintiff must actually allege circumstances demonstrating an adverse employment action. *See Daniels v. United Parcel Serv., Inc.,* 701 F.3d 620, 627 (10th Cir. 2012). But "'[r]eassignment of job duties is not automatically actionable.'" *Id.* at 635

4

(quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 71 (2006))   "An adverse employment action is a *significant* change in employment status, such as a hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a significant change in benefits."   *Id.* at 635 (emphasis in original) (internal quotation marks omitted).   Thus, moving an employee permanently to a night-shift position is not an adverse-employment action for purposes of Title VII when the plaintiff's "job classification did not change," his salary is not decreased, and there is no evidence showing that the duties "differed significantly" from the employee's previous position. *See id.* at 636.

### C.   Discrimination claims and shifting burdens

"Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption.   [I]t requires proof of an existing policy which itself constitutes discrimination or oral or written statements on the part of a defendant showing a discriminatory motivation."   *Hall v. United States DOL,* 476 F.3d 847, 854-55 (10th Cir. 2007) (internal quotation marks and citation omitted),   "Our precedent makes clear that evidence is not 'direct' if an inference of discrimination is required." *Riggs v. AirTran Airways, Inc.,* 497 F.3d 1108, 1118 (10th Cir. 2007).   "A plaintiff alleging discrimination on the basis of race may prove intentional discrimination through either direct evidence of discrimination (e.g., oral or written statements on the part of a defendant showing a discriminatory motivation) or indirect (i.e., circumstantial) evidence of discrimination."   *Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d 1220, 1225 (10th Cir. 2000).   When considering a violation of the NMHRA, § 1981, or Title VII in the

summary-judgment context when a plaintiff does **not** produce direct evidence of discrimination, the Court applies the *McDonnell-Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1972)*; Kendrick*, 220 F.3d at 1225-26 & n.4; *Juneau v. Intel Corp*., 139 N.M. 12, 15, 127 P.3d 548, 551 (2005). Because, in the absence of direct evidence of discrimination, it is easy to speculate that an employer's adverse action was motivated by discriminatory intent, the *McDonnell-Douglas* test was created, to

> demand that the alleged discriminatee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought.   Elimination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one.

*Teamsters v. United States,* 431 U.S. 324, 358, n. 44 (1977).

> Under the *McDonnell Douglas* framework, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. Once the plaintiff has established a prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its employment action.   *See id.* at 802, 93 S.Ct. 1817.   If the defendant makes this showing, the plaintiff must then show that the defendant's justification is pretextual.   *See id*. at 804, 93 S. Ct. 1817.

*Kendrick,* 220 F.3d at 1226; *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (accord).

The United States Supreme Court emphasized long ago, however, that "the *McDonnell-Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."   *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (noting that "[t]he shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure

6

that the plaintiff has his day in court despite the unavailability of direct evidence" and refusing to apply the analysis where there was direct evidence of age discrimination) (internal quotation marks and bracket omitted). But "[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on her gender in making its decision. In making this showing, stereotyped remarks can certainly be *evidence* that gender played a part." Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989) (italics in original) (overruled in part on other grounds by 42 U.S.C. § 2000e-2(m)). Our Tenth Circuit has followed the *Thurston* and *Price-Waterhouse* standards in various situations.

> When a plaintiff offers direct evidence of discrimination in a Title VII claim, her claim may move forward without being subjected to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). *See Ramsey v. City & Cnty. of Denver,* 907 F.2d 1004, 1007–08 (10th Cir. 1990) ("'[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination.'" (quoting *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S. Ct. 613, 83 L.Ed.2d 523 (1985))). The classic example of direct evidence of discrimination comes from *Trans World Airlines,* where the Supreme Court held that an explicit, mandatory age requirement was direct evidence of age discrimination. 469 U.S. at 121, 105 S. Ct. 613.

> Comments in the workplace that reflect personal bias do not qualify as direct evidence of discrimination unless the plaintiff shows the speaker had decisionmaking authority and acted on his or her discriminatory beliefs. *Ramsey,* 907 F.2d at 1008. We also have explained that discriminatory statements do not qualify as direct evidence if the context or timing of the statements is not closely linked to the adverse decision. *Riggs v. AirTran Airways, Inc.,* 497 F.3d 1108, 1118 (10th Cir. 2007). Furthermore, if the content and context of a statement allow it to be plausibly interpreted in two different ways—one discriminatory and the other benign—the statement does not qualify as direct evidence. *Id.*

7

*Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (holding that a decisionmaker's statements made during an interview, which "expressed discriminatory beliefs about whether members of the plaintiff's protected class are capable of doing the job at issue" were direct evidence of discriminatory intent because "[t]he content of his statements, the interview context, and the temporal proximity to the adverse employment decision directly link the discriminatory statements to his decision not to promote").

> To prove discrimination or retaliation directly under the direct method of proof . . . a plaintiff needs evidence that directly reflects the forbidden animus, regardless of whether that evidence is direct or circumstantial. Thus, the statement "You're fired, old man" may be used to prove age discrimination directly, even though it constitutes circumstantial evidence with respect to the ultimate question of whether the employer fired the employee because of his age.

> In addition, courts sometimes conflate circumstantial *evidence* with the indirect *method of proof.*  But as the foregoing discussion suggests, these are also separate concepts. "[A]lthough some of our cases seem to suggest otherwise," plaintiff is not limited to the *McDonnell Douglas*/indirect method of proof simply because he or she relies on circumstantial, rather than direct, evidence of discrimination or retaliation. *Fye,* 516 F.3d at 1226.  Rather, circumstantial evidence can be used to establish discrimination or retaliation directly if it is directly tied to the employer's unlawful motive.

> In short, courts and litigants should be careful not to confuse the *character of evidence* (direct vs. circumstantial) with the *methods of proving discrimination or retaliation* (direct vs. indirect).  Drawing a distinction between direct and circumstantial evidence is of minimal usefulness in discrimination and retaliation cases, as only in the rarest of situations will an employee have direct evidence of discrimination or retaliation.  In those cases, assuming that the employee's evidence is believed, the employee can prove discrimination or retaliation directly.  In the vast majority of cases that involve only circumstantial evidence, however, the crucial inquiry is whether the employee's circumstantial evidence proves discrimination or retaliation, either directly or indirectly.

*Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1000 n.8 (10th Cir. 2011).   In short,

> [a] plaintiff may prove violation of Title VII or 42 U.S.C. § 1981—the standards

are the same, *see Aramburu v. Boeing Co.,* 112 F.3d 1398, 1403 n. 3 (10th Cir.1997) (citations omitted)—either by direct evidence of discrimination, *cf. Fischer v. Forestwood Co.,* 525 F.3d 972, 983 (10th Cir.2008), or by adhering to the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

*Crowe v. ADT Sec. Serv., Inc*., 649 F.3d 1189, 1194 (10th Cir. 2011).

## II.   UNDISPUTED BACKGROUND FACTS.

Plaintiff is an Hispanic male.   *See* Compl. at 3.   Although his Complaint inexplicably does not mention his country of origin, his EEOC claim (which he referenced in his Complaint but initially failed to attach to his Complaint) states that his national origin is "Mexican."   Doc. 63-1.   Defendant hired Plaintiff in 2000 as an hourly associate in its El Paso, Texas club.   *See* Comp. at 2.   After several promotions, Plaintiff was transferred to Defendant's Roswell, New Mexico club in 2007, and in 2008, Plaintiff became a Hardlines Assistant Manager.   *See id.*   In El Paso, Plaintiff requested to work nights, but later, he worked both during the days and on the "overnight" shift at various times, as directed by the club manager.   *See* Doc. 47-1 at 3-4 (Plaintiff's Depo.).   After he transferred to Roswell and was promoted to an Assistant-Manager position, Plaintiff regularly worked only days until May 2009.

In March 2009, Jerry Thompson, an Anglo male, became the Roswell-club manager and Plaintiff's direct supervisor.   *Id.*   At the time Thompson became manager, about 50% of the Roswell employees were Hispanic,   *See* Doc. 47-1 at 10.   There were six Assistant Managers -- three Hispanics (including Plaintiff) and three Anglos -- and all of them except for one – David Densmore, an Anglo Overnight Merchandise Assistant Manager -- worked the day shift.   *See* Doc. 47-1 at 6.   But the written job description for all Assistant

Managers contained a provision requiring them to "work[] overnight and on varying shifts as required."   Doc. 47-2 at 6.   Although Plaintiff did not like Thompson's management style from the beginning, finding him to be "unapproachable" and "aggressive," the first allegedly discriminatory act occurred on May 3, 2009, when Thompson told Plaintiff that he was being moved to the Overnight Merchandise Assistant Manager position, which was the highest position in the club at night.   *See* Doc. 47-1 at 4.   Accordingly, Plaintiff was required to change places with David Densmore.   *See id.*; Doc. 52-1 at 15.

Between 2000 and November 2005, Plaintiff had been "coached" 5 times for performance issues, including one "decision-making day coaching[2]."   Compl. at 2.   In addition, on November 24, 2008, Roswell club Manager Ryan Cruz, an Hispanic male, issued a "verbal" coaching to Plaintiff for failing to properly "execute" three different sales "events" that month, which caused the club to lose money.   *See* Doc. 47-5 at 1.   Plaintiff admits that he failed to execute those sales events because he was on vacation at the time they were supposed to be executed.   Doc. 47-1 at 13.   He had "discussed" executing the events with employees in departments who "reported to" him, before he left, but "it wasn't done."   *Id.*   Plaintiff, therefore, agreed that his "coaching" was warranted because he was ultimately responsible for ensuring that the events were executed.   *See id.*   Plaintiff received two more disciplinary coachings in 2009 and 2010 by Thompson.   One was a verbal coaching for insubordination, *see* Doc. 42-6, and the other was a "decision-making-day" coaching for violating company policy, *see* Doc. 42-8.   Thompson ultimately terminated Plaintiff from his position on May 11, 2010, after

---

[2]   A "decision-making day" disciplinary coaching represents "the final opportunity for an associate to evaluate [his] behavior in view of [Defendant's] expectations prior to Termination" and may be given only once in a 12-month period.   Doc. 47-4 at 3.

Plaintiff refused to accept a demotion and after he had received another coaching from Thompson for misconduct by failing to comply with Thompson's orders to make sure that the overnight merchandise crew had properly transitioned the stock and signage in the store from Mothers' Day stock to summer stock.   *See* Doc. 47-2 at 3.   Plaintiff was replaced by an Anglo employee.   *See* Doc. 52-2 at 15.

In his Complaint, Plaintiff concluded that "Thompson had finally been able to find a way to get Plaintiff out of management and back to an hourly position where he thought Mexicans belonged;" that Plaintiff was "demoted as a result of his national origin;" and that "Thompson terminated Plaintiff from his position as a result of his national origin." Compl. at 4.   Plaintiff also concludes that these acts "constitute . . .intentional discrimination because of Plaintiffs [sic] ancestry or ethnic characteristics in violation of Section 1981."   *Id.* at 6.

## III.   ANALYSIS

### A.   Claim for hostile-work environment.

In his Complaint, Plaintiff alleged that there were

> numerous occasions where Thompson would walk the store with Plaintiff while giving directives on what needed to be done.   During these walks, Thompson would constantly make jokes about Mexicans.   He would degrade Mexicans especially regarding their intelligence.   The jokes were uncalled for and were in no way related to any conversation Thompson was having with Plaintiff.   Plaintiff did not make note or complain to anyone because Thompson was the Club manager and his supervisor.   During the walks, when an employee of Mexican origin would make a mistake, Thompson would use the phrases, "Freakin' Mexicans can't do shit" or "Golly, freakin' Mexicans can't do anything right."   He would couple these comments with ethnic jokes making fun of Mexicans and their "lack" of intelligence.

Compl. at 2-3.   But the Complaint does not expressly seek damages based on a hostile

work environment.

In its motion for summary judgment, without discussing all of the specific harassing or abusive-workplace incidents alleged in the Complaint, Defendant contends that "[t]he Court also should not give any credence to Plaintiff's implication that he was subjected to a racially hostile work environment by Mr. Thompson," and that "testimony that Mr. Thompson addressed him as Mexican, or called his crew Mexican from time to time, does not rise to the level of conduct required to establish hostile work environment harassment."   Doc. 47 at 15-16.

In response, to the summary-judgment motion, Plaintiff points to his deposition testimony regarding several conversations he allegedly had with Thompson[3].   At his deposition, Plaintiff was asked to relate all of the discriminatory statements Thompson made that offended him[4].   Doc. 52-1 at 12.   On an undisclosed date, Thompson allegedly said, "Your Mexican night crew is not - - you need to change it up.   . . . [Is] it because you're Mexican you're not getting the job done?"   Doc. 52-1 at 12.   Another time, Thompson said, "you need to fix your people."   *Id.*   Another time Thompson remarked, "what's up with the Mexican night crew, man, you need to step 'em up."   *Id.*   Another time, in June 2009, upon seeing "crooked pallets or misplaced merchandise or just different

---

[3]   The Court will not consider inadmissible hearsay evidence on summary judgment, and therefore will ignore Plaintiff's statements about what other employees allegedly told him about Thompson's alleged motivations and dislikes.   *See Johnson v. Weld Cnty., 594 F.3d 1202, 1210 (10th Cir. 2010)*.   The Court will also disregard affidavits that were originally submitted in a case prosecuted by Plaintiff's counsel involving a different plaintiff and different facts because they are irrelevant to Plaintiff's specific allegations and claims in this case.

[4]   In the response brief, Plaintiff's counsel states "Plaintiff was told, 'So are you gonna stay frickin' Mexican.   Come on you dumbass.' And he would laugh when the comments were made. (*Id.* at p. 229, lns. 1-4)."   Doc. 52 at 4.   But counsel failed to include in the summary-judgment record the deposition page on which Plaintiff allegedly testified to this statement, so the Court will disregard it.

little things that could be fixable . . . real quick," Thompson allegedly said, "you need to tell your people to get this done."   *Id.*   Although Thompson did not mention Mexicans during that conversation, Plaintiff interpreted Thompson's use of the words "your people" to mean "your Mexican night crew."   *Id.* at 13.   When asked if there were any other incidents, Plaintiff repeated the prior example, but this time he stated that, in December 2009, upon seeing "a pallet being crooked, signs missing," Thompson said, "what's up with your Mexican night crew, man? . . . You need to tell 'em something, get on 'em."   *Id.* at 13.

   Plaintiff states that, around November 2009, when talking about "Daniel [Orozco], in freezer/cooler – Hispanic, Mexican, Latino," Thompson said to Plaintiff, "why don't you take that Mexican out of there" and replace him with a white crew member (whose name Plaintiff could not remember[5]), who "maybe [] can do a better job.".   Doc. 52-2 at 2. In January 2010, Thompson allegedly told Plaintiff:  "Do I need to bring back David Densmore?  I'm pretty sure that, being white . . . he'll do a better job than you."   Doc. 52-1 at 14.   Plaintiff states that Thompson called him "Mexican" "at different. . . times," Doc.52-2 at 2, and that he said, "stupid Mexican" *id.* at 5.   In February 2010, Thompson allegedly said to Plaintiff, "hey, frickin' Mexican, get over here."   Doc. 52-2 at 5.   In response to this remark, Plaintiff states that he told Thompson, "it's been already a couple of months of this, you need to calm down."   Doc. 52-2 at 9.   Plaintiff states that Thompson also called the night crew "Hispanics, Browns."   *Id.* at 2.

---

[5]   This statement contradicts Plaintiff's sworn testimony that none of Plaintiff's other night crew members were white except for Danny Stewart, the team leader   But the Court will not weigh credibility..

Although he swore in his Complaint that he "did not make note or complain to anyone [about Thompson's name-calling or negative comments about Mexicans] because Thompson was the Club manager and his supervisor," Compl. at 2, at his deposition Plaintiff stated that he did, in fact, complain "four times" to Robert Francis, a human-resources manager from the Defendant's main office.   Doc. 47-1 at 5.   In June, 2009, he told Francis he didn't "want to be . . . on nights anymore," to which Francis responded, "it's out of my control."   *Id.*   He later complained to Francis that new managers-in-training were getting day-crew positions that Plaintiff thought he should get because he "had done night crew for so long."   *See id.*   In November 2009, Plaintiff states that he complained to Francis that he "didn't feel comfortable . . . working with [Thompson] . . . being always very negative against me, . . . calling my night crew names, calling me names.   That's not how I want to work."   Doc. 52-2 at 6.   He states that he again called Francis in March 2010 and requested a transfer.   Doc. 52-2 at1.   This time, he told Francis he did not feel "comfortable" working with Thompson because, "on different occasions," Thompson "called me Mexican, he's referred to my night crew as Mexicans, he's referred to my night crew as 'your people,' like being Mexicans."   *Id.*.   Francis submitted an affidavit that is consistent with Plaintiff's previous sworn allegations in the Complaint that Plaintiff **did not** complain to him about race or national-origin discrimination.   *See* Doc. 54-1 at 3, ¶¶ 8, 9.   But, again, the Court may not make a credibility determination or weigh the evidence.

After Plaintiff complained at the deposition that he was being "intimidated" because Defendant's counsel was questioning him about his allegations, counsel

14

explained, "I need to know if this is something that happened every day or if it happened five times." Doc. 52-2 at 10. Plaintiff responded, "every day it would happen. Every day I wouldn't want to see [Thompson] come to work cause of the way he previously talked to me. All of the comments he would make to me, telling me, 'Mexican, fricking Mexican,' you know, 'Hispanics can't do shit.'" *Id.* Plaintiff testified that because of Thompson's comments, he "dreaded going to work" and his "whole personality changed." Doc. 52-2 at 3. In its reply brief, Defendant again does not discuss Thompson's alleged use of the perjorative terms "frickin" or "stupid" to describe Mexicans, or Thompson's alleged statements that Mexicans and Hispanics are incompetent, or his alleged threat to replace Plaintiff with a more competent Anglo or his comment that Plaintiff should replace an incompetent Mexican night-crew member with a "white" employee.

When a racial discrimination claim is alleged, the analysis is the same whether a hostile-work-environment claim is brought under Title VII or § 1981.

> To survive summary judgment on a racially hostile work environment claim, a plaintiff must show "that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus." *Bolden v. PRC Inc.,* 43 F.3d 545, 551 (10th Cir. 1994) (citation omitted). A plaintiff cannot meet this burden by demonstrating "a few isolated incidents of racial enmity" or "sporadic racial slurs." *Id.,* quoting *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1412–13 (10th Cir. 1987). Instead, "there must be a steady barrage of opprobrious racial comments." *Id.*

*Chavez v. New Mexico,* 397 F.3d 826, 833 (10th Cir. 2005) (Title VII case); *Mitchell v. City & County of Denver,* No. 02-1263, 12 Fed. App'x. 662, 671, 2004 WL 2287756, **7 (10th Cir. Oct. 12, 2004) ("Under § 1981, a prima facie case of racial harassment/hostile work environment requires Mitchell to show, 'under the totality of the circumstances (1) the

15

harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus'"). The word "opprobrious" means, *inter alia* "expressing contemptuous reproach; scornful or abusive." Am. Heritage Coll. Dictionary (3d ed.).

The "pervasive-or-severe" test is disjunctive, and either element may provide an independent ground for finding a hostile-work environment. *See Smith v. Northwest Fin. Acceptance, Inc.,* 129 F.3d 1408, 1415 (10th Cir. 1997). Courts "determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787–88 (1998) (internal quotation marks omitted). "[O]ne can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2440 (2013) (internal quotation marks omitted). The working environment does not have to become that egregious, however, for a hostile-work-environment claim to lie.

> But Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

16

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

> While courts have tended to count events over time to determine pervasiveness, the word 'pervasive' is not a counting measure. The trier of fact utilizes a broader contextual analysis. It begins with the number, sequence, and timing of the conduct. The factfinder then looks at the nuances of an environment that is imposed by each instance of discriminatory behavior."

*Smith.,* 129 F.3d at 1415. But the Tenth Circuit has held that "the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact." *O'Shea v. Yellow Tech. Serv., Inc.,* 185 F.3d 1093, 1098 (10th Cir. 1999) (internal quotation marks omitted).

To establish the subjective component of a hostile work environment, it is sufficient if a plaintiff's "testimony reflects that [a supervisor's] comments were intolerable, publicly made, and caused humiliation and a loss of self-respect." *Smith*. 129 F.3d at 1413. A "public setting . . . increase[s] the humiliation, and, therefore, the severity of the discriminatory conduct." *Id.* at 1414. Further, when racially-charged invectives are "directed solely at Plaintiff [] [t]his may be a relevant factor in determining a hostile work environment." *Id.* "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998) (internal quotation marks omitted).

"[D]raw[ing] all reasonable inferences in favor of" the Plaintiff" on the issue of hostile work environment, *see EEOC v. PVNF, LLC,* 487 F.3d 790, 797 (10th Cir.2007), the Court concludes, on the summary-judgment record, that there is a genuine issue of material fact whether Thompson made numerous uncalled-for and racially-perjorative

and contemptuous comments to the Plaintiff while supervising his work.   If the jury were to believe Plaintiff, Thompson's threat to replace Plaintiff with **a** white man who would be more competent, and his instruction that Plaintiff should replace a Mexican employee with a more competent white employee, combined with calling Plaintiff a "fricking Mexican" and comments that Mexicans were "stupid" and that the overnight crew members were incompetent because they were Mexican, which Plaintiff has sworn occurred on a daily basis during approximately a one-year period, and which caused him to dread going to work and changed his personality, are sufficiently severe and pervasive for a jury to find that the remarks created a work environment abusive to Plaintiff because of his race.   *Cf. Smith*, 129 F.3d at 1414 (concluding that "approximately six statements made by [by the supervisor to the plaintiff] over her twenty-three month employment" were "sufficient to support a finding of pervasive harassment").   Simply put, Defendant wholly failed to meet its burden on summary judgment and the Court will not dismiss Plaintiff's claims based on a hostile work environment.

### B.   Claim for racial discrimination.

Based on the direct evidence of discriminatory motive related to Plaintiff's termination described above – *i.e.,* Thompson's alleged statements that (i) Plaintiff and his crew were not getting the job done because they are Mexican, and (ii) Thompson may have to replace Plaintiff with a more competent white assistant manager; coupled with the fact that an anglo employee who was only a "team leader," as opposed to an assistant manager, replaced Plaintiff, *see* Doc. 52-2 at 15, the *McDonnell-Douglas* burden-shifting test is not

applicable in this case[6].  *See Thurston*, 469 U.S. at 121; *Tabor*, 703 F.3d at 1216; *Twigg*, 659 F.3d at 1000 n.8.   Thus, even though Defendant has presented evidence that it had a legitimate reason for firing Plaintiff, a jury could choose to believe Plaintiff and disbelieve Defendant, and find for the Plaintiff.

Further, contrary to Defendant's assertion, it is not undisputed that Defendant had a valid reason for terminating Plaintiff.   Plaintiff testified that he had a legitimate medical reason for not showing up to work on May 9; that he had never before called in sick; that he informed Thompson on May 8 and again on May 9 that he was injured and that the doctor told him not to work for two days; and it is undisputed that Plaintiff contacted Mr. Pena, a team leader on the night shift, on May 9 and asked him to make sure that the Mother's Day transition was executed, and Pena agreed to do so.  *See* Doc. 52-1 at 8-13.   Defendant contends that "Plaintiff lost his employment, in part, because he did not ensure he and his crew executed the Mother's Day to summer event."  Doc. 54 at 9.   A jury could reasonably question Thompson's actions and motives on May 9-10, however, because

_____

[6]   Even if it were applicable, Defendant consistently misrepresents that a Title VII plaintiff must demonstrate as part of his *prima facie* showing that he was "satisfactorily performing his job," and that Plaintiff is unable to do so because he received several coachings and was terminated.  Doc. 47 at 10-11 (citing *McDonnell Douglas Corp* and *Daniels v. United Parcel Serv.,* 701 F.3d 620, 627 (10th Cir. 2012)); Doc. 54 at 11.   But *McDonnell Douglas Corp.* states that "[t]he complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas Corp*., 411 U.S. at 802.   And *Daniels* states that, under *the McDonnell-Douglas* "framework, a plaintiff must first establish a *prima facie* case of discrimination by showing (1) membership in a protected class and (2) an adverse employment action (3) that took place under circumstances giving rise to an inference of discrimination." 701 F.3d at 627.  Neither case, nor any other case of which the Court is aware, requires a Title VII plaintiff to make a prima facie showing that he was "satisfactorily performing his job."

Thompson was actually at the club on the evening of May 9 when the Mother's-Day-to-Summer transition was to occur and knew that Plaintiff was hurt and was not coming in on his doctor's advice, but he instructed Pena **not** to help Plaintiff, did not bring Densmore or another Assistant Manager in to cover for Plaintiff, and did not himself instruct the merchandise-night crew what they needed to do, but instead simply left the job undone and then told Plaintiff he would be demoted or terminated because the job did not get done.  *See id.* at 11, 14; Doc. 47-2 at 8.   In addition, even though Plaintiff signed off on his prior coachings by Thompson and did not complain to higher management about them, Plaintiff challenged their validity during his deposition, contending that Thompson had either changed his mind about his instructions after Plaintiff had acted on the prior instructions or that Thompson had actually instructed Plaintiff to do an act that violated company policy.  *See* Doc. 52-1 at 7-8, 11.   It is a jury's job to see where the truth lies.

Further, "to obtain an instruction under § 2000e–2(m), a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, . . . or national origin was a motivating factor for any employment practice.'"  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003).   That evidence may be either direct or circumstantial.  *See id.*   Thus, even if a jury believed both parties, under a mixed motive analysis, the Plaintiff could still prevail, although his remedies would be limited.  *See* 42 U.S.C. § 2000e–5(g)(2)(B).

There are genuine issues of material fact regarding Thompson's motivations behind Plaintiff's termination, thus Defendant is not entitled to summary judgment on the claim for racial discrimination based on Plaintiff's termination.

**C.   Claim for racial discrimination based upon change to night shift.**

In his Complaint, Plaintiff asserts that, because Thompson wanted to make "his daytime management an all-Anglo management," Thompson made Plaintiff switch jobs with Densmore, an Anglo Assistant Manager.   Compl. at 1.   At his deposition, Plaintiff testified, however, that two Hispanic Assistant Managers remained on the day shift after Plaintiff was moved to nights, and Thompson also switched an Hispanic night-shift team leader with an Anglo who worked days.   *See* Doc. 52-1 at 7, 14.   He further testified that Thompson assigned Plaintiff to "help Densmore out" several times at night before he moved Plaintiff to that job permanently, Doc. 52-1 at 15; and that Thompson told Plaintiff that he moved him to that position because he was "better at nights" and "because someone like [Plaintiff] needed to be on nights."   Doc. 47-1 at .6.   Thompson states in his affidavit that he placed Plaintiff in that position in part because "he was more experienced than the newer, non-Hispanic Assistant Managers who required more supervision than Mr. Orozco."   Doc. 47-2 at 1 (Thompson Aff.).   Plaintiff does not dispute that he was more experienced; he just believes that an inexperienced assistant manager could have done the overnight assistant-manager job.   See Doc. 52-1 at 5.   Although there was no decrease in pay, Plaintiff considered the job to be a demotion because he did not want to work at night, and he told Thompson that he did not want to move to that position.[7]   *See.* Doc. 47-1 at 6.

Defendant has established, as a matter of law, that Plaintiff's assignment as the overnight-crew Assistant Manager was not an adverse employment action.   It is undisputed that Plaintiff's job description required that he work the overnight shift; his

---

[7]   Orozco's deposition testimony disputes Thompson's affidavit stating that Orozco requested the night-shift job, so the Court resolves all disputes in favor of the non-moving party.

"job classification did not change," his salary or benefits were not decreased, and there is no evidence showing that his duties "differed significantly" from his previous position. *See Daniels,* 701 F.3d at 636.   That is not to say, however, that Plaintiff may not present evidence of the change to a less-desirable schedule to a jury in support of his claim that Thompson's actions toward Plaintiff throughout the year he supervised Plaintiff were motivated by a desire to discriminate against him.

**IT IS THEREFORE HEREBY ORDERED** that Defendant's motion for summary judgment [Doc. 47] is **GRANTED**-in-part as follows: Defendant is granted summary judgment on the discrimination claim based on moving Plaintiff to the night-shift position; and the motion is **DENIED** on all other grounds.

**SO ORDERED** this 12th day of March, 2014 in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
**CHIEF UNITED STATES DISTRICT JUDGE**